**STATE of Missouri, Respondent,**

**v.**

**Cleola ARCHER, Appellant.**

No. 47340.

Supreme Court of Missouri,

Division No. 1.

Nov. 9, 1959.

Clarence E. Godfrey, St. Louis, for appellant.

John M. Dalton, Atty. Gen., James B. Slusher, Asst. Atty. Gen., for respondent.

HOLLINGSWORTH, Chief Justice.

Defendant, Cleola Archer, has appealed from a sentence of the Circuit Court

of the City of St. Louis imposed upon her in conformity with the verdict of the jury finding her guilty of murder in the second degree of Alphonso B. Bowman and assessing her punishment at imprisonment in the State Penitentiary for a term of twenty-five years. No brief has been filed in her behalf and we therefore review the valid assignments of error set forth in the motion for new trial and the essential portions of the record as required by S.Ct. Rules 27.20 and 28.02, 42 V.A.M.S.

The motion for new trial assigns error in (1) the refusal of defendant's motions for a judgment of acquittal filed at the close of the State's case and at the close of all of the evidence, (2) the refusal of her proffered Instruction 8 relating to the consideration the jury should give to any statement or statements made by her in relation to the crime charged, and (3) other matters hereinafter noted.

The evidence adduced in behalf of the State warrants a finding of the following facts: On and for about six months prior to June 10, 1958, defendant and Alphonso B. Bowman lived together in an apartment at 3310 Bell Avenue in the City of St. Louis. That apartment was about one and one-fourth blocks from an automobile filling and service station located on the southeast corner of the intersection of Bell and Compton Avenues, at which Bowman was and had been employed for several years. About 6:30 o'clock on the morning of June 10, 1958, shortly after reporting for work, Bowman sought and was granted permission of his employer, Charles Anderson, to go to the apartment in which he and Cleola resided. He returned about 7:00 a. m., at which time he was assigned the job of washing a station wagon. He put on a wash uniform, boots and apron and went to the washrack near the curb, carrying a towel and the forward end of a rubber hose, the rear end of which was attached to a water outlet elsewhere on the premises. There was a threaded metal band attached to the forward or outlet end of the hose

but no nozzle was affixed to it. At that time Mr. Anderson was sitting on a bench outside the station, two station employees were in the station office and two men, bystanders, were conversing near the southeast corner of the intersection of Bell and Compton. Bowman stood near the rear end of the station wagon and began pouring water on it from the hose. Defendant came up to Bowman and they conversed. She called him a "bad name" and Bowman was heard by the two bystanders to say, "I did do ———," but they could not hear the remainder of his statement. Defendant turned and walked a short distance from Bowman, then "wheeled" and went back to him and began to strike him repeated hammer-like blows in the region of his upper chest, during which time he was backing away and fending off her blows with the end of the hose from which water was running. One of the men on the sidewalk called out to the employees at the station, "Why don't you stop that woman from killing that man?" That remark directed the attention of Mr. Anderson and the two employees in the station to the difficulty. They then saw defendant delivering the blows above described, saw Bowman retreating backward and waving the hose to avert them and saw defendant advancing and continuing to beat him as he retreated. After retreating a few steps, Bowman turned toward the station office, took one or two steady steps, staggered and fell bleeding and apparently unconscious into the open doorway of the station. Defendant left the scene before Bowman fell.

The police were called and arrived within a few minutes. Bowman was taken immediately to the hospital and Mr. Anderson and three policemen started in search of defendant. Bowman was dead on arrival at the hospital and his body was taken to the morgue. Examination of his body by the coroner's court autopsy physician and pathologist, Dr. John J. Thomas, revealed five penetrating stab wounds in the upper portion of his chest, one of which had entered the arch of the aortal artery, causing his

death from massive intrathoracic hemorrhage. Mr. Anderson and the three policemen found defendant at the apartment in the act of changing her clothing. She had removed her dress and was slipping into another. The dress she had removed was wet with water and had blood on it. When asked what she had used in stabbing Bowman, she produced a pair of scissors from the pocket of the dress she had removed and gave them to the officers. The scissors belonged to a barber, George Higgins, who had left them at the Bowman-Archer apartment after using them in cutting defendant's and Bowman's hair several weeks prior to the date of the killing. The scissors were more than five inches long and the blades were more than three inches in length.

The police arrested defendant and took her to a hospital, where the physician in charge of emergency cases, Dr. Howard Golden, saw and examined her face and head about 7:45 a. m. He found a small laceration on the inside of her lower lip. Upon manipulation of her jaw she complained of tenderness in her upper front teeth. No other evidence of injury was found. He gave her a mild sedative and she was taken to the police station. She there made an oral statement to the police as to what had occurred. She was asked if she would make a signed statement and was advised that she did not have to make it. As questions were asked her and her answers were given, they were typewritten by a clerk, read over to her and signed by her.

Police Officer John Ross identified State's Exhibit 9 as the written statement made by defendant and identified the signatures of defendant and himself appearing at the bottom thereof. Over the sole objection of defendant that "sufficient foundation has not been laid by authenticating said Exhibit No. 9," it was admitted into evidence. In substance and insofar as material, the statement recited that defendant and Bowman had an argument about 10:30

"last night", following which she had gone to bed; that upon wakening the next morning (June 10, 1958) she dressed and started upstairs to return to George Higgins the scissors he had left at her and Bowman's apartment when he had cut their hair several weeks prior; that when she came out of her apartment, she saw Bowman standing at the filling station driveway and walked down to him; that she asked Bowman why he was trying to play her for a fool; that he admitted he was wrong; that defendant turned around and started home; that Bowman called her back and told her he had taken part of his clothing and was going to get the rest of it; that she told him to get it right then; that he started beating her in the face and head with a hose and she started stabbing him with the scissors which she held in her right hand; that she then went home and changed her dress, which was wet from the water coming from the hose.

Defendant testified in her own behalf, as follows: Bowman threatened her almost every day, telling her "if he catched me messing up he would hang me"; that he hit her once, about three weeks before June 10, 1958; that on that morning she left their home, intending to return some scissors to George Higgins and to try to borrow some money from him; that after getting to the sidewalk she saw Bowman at the filling station, changed her mind and went to him to ask him for the money, instead of Higgins; that she spoke to Bowman, he raised up from his work and told her he had moved part of his clothing and was going to get the rest of it; that she told him to come get the rest; that she walked off, he called her back, and she went back; that he started beating her over the head with a hose; that she did not know whether she struck him with the scissors before he started beating her over the head; that she just got scared, "went all to pieces; I guess, I did"; that she "guessed" he hit her over the head two or three times before she got the scissors from her dress pocket and started to do

anything; that she did not take the scissors with intent to do him any harm; that all she wanted was some money to get cigarettes and so forth; that she imagined he hit her lip with the hose, it began to hurt during that time.

Cross-examined as to her statement (State's Exhibit 9), she said she remembered making the statement and signing it and identified her signature, and further:

"Q. Do you remember giving him answers to the questions? A. Yes, sir.

"Q. And do you remember signing this paper that was typed up? A. Yes, I remember.

"Q. You remember signing it. You remember the police asking you what happened? A. Yes, I remember it. I was kind of groggy, though, I remember it.

"Q. Do you remember telling the police what happened? A. Yes."

And then on redirect examination, she testified:

"Q. And he [the doctor] gave you a sedative. Is that correct? A. Yes, sir.

"Q. As a result of having been hit on the head and receiving that sedative when you were being questioned by the police, do you recall exactly what occurred? A. When he gave me the sedative?

"Q. Did that affect you in any way? A. Yes, sir; it made me dizzy about the head.

"Q. Well, I showed you this statement, did I not—that written statement here? A. Yes.

"Q. That is substantially correct? The main parts of it are correct? A. Partly.

"Q. Were there things you told them they didn't bother putting down?

"A. Well, exactly the way I told it now, that's the way it was. There were some things I told you, or not, they didn't put it there.

"Q. But most of the things in there are true. Is that correct? A. Yes, sir."

Following the signing of the statement, defendant was again taken to the hospital for the purpose of a more complete examination to determine whether there was any evidence of trauma in addition to the laceration of the inner surface of her lower lip. That examination, made at 1:45 o'clock that afternoon, revealed none.

The court instructed the jury on the issues of murder in the second degree, manslaughter, self-defense, and the unintentional killing of Bowman during mutual combat.

■■■ Murder in the second degree is defined as the killing of a human being willfully, premeditatedly and with malice aforethought, but without deliberation. State v. Baber, Mo., 297 S.W.2d 439, 441; State v. Vincent, Mo., 321 S.W.2d 439, 442. The evidence above set forth, viewed in the light most favorable to the State (as the reviewing court is required to view it, State v. Stehlin, Mo., 312 S.W.2d 838, 839), is clearly sufficient to support a finding of every essential element of murder in the second degree. Consequently, the trial court did not err in overruling defendant's motion for a judgment of acquittal filed at the close of all of the evidence; and, of course, the error, if any, in overruling her motion for such judgment filed at the close of the State's case was waived by the introduction of evidence in her own behalf. State v. Edmonson, Mo., 309 S.W.2d 616, 617; State v. Richardson, Mo., 315 S.W.2d 139, 140; State v. Vincent, Mo., 321 S.W. 2d 439, 440.

Defendant's proffered Instruction No. 8, the refusal of which she complains, reads as follows:

"If you believe and find from the evidence that the defendant made any statement or statements in relation to the offense charged, after such offense is alleged to have been committed, you should consider such statement or statements altogether and in the light of the circumstances under which they were made, if you find and believe they were actually made. If you find such statement or statements were not voluntarily made but were procured by defendant's physical disability due to injuries and by a sedative, then you should disregard them altogether."

■ In support of her contention that the court erred in refusing Instruction No. 8, defendant says: that S.Ct. Rule 26.02 (6) makes it the duty of the trial court to instruct the jury upon all questions of law necessary for their guidance in arriving at a verdict; that the testimony of Dr. Howard Golden relative to the condition in which he found defendant at 7:45 o'clock on the morning of her arrest and the fact that he gave her a mild sedative to quiet her nerves, when coupled with the portions of her testimony above quoted, presented a question of law within the meaning of the Rule; and that, as further provided in said Rule, the failure to give said instruction constituted good cause for reversal of the judgment rendered herein. The difficulty with that contention is that the testimony above referred to constitutes no evidence whatsoever that the statements made by the defendant to the police were not voluntarily and rationally made. Defendant made no such claim or assertion during the trial. In fact, the statement, in large measure, follows the testimony given by her at the trial and, when considered in its entirety, negates the contention now made. The transcript further shows that the trial court volunteered the only statement found in the transcript with reference to the contention now made. In refusing the instruction, the court said: "Instruction number 8 is offered by the defendant and is denied on the ground there is no evidence to support the giving of such instruction. There is no testimony by the defendant that she didn't understand the nature of whatever statement she made to the police officer. The fact that she may have been given a sedative—there was not any evidence she didn't have full faculties, and didn't so testify." We hold that the trial court correctly construed the evidence in that respect and committed no error in refusing the instruction.

■ Defendant's next assignment is that the verdict is against the weight of the evidence. The assignment is insufficient under S.Ct. Rule 27.20. However, the appellate court does not weigh the evidence; it determines only whether there is sufficient substantial evidence to support the verdict. That we have done. See State v. Campbell, Mo., 292 S.W.2d 297, 299.

■ Defendant's final assignment is that "the verdict of the jury was such as to constitute cruel and unusual punishment." That assignment is also insufficient under S.Ct. Rule 27.20. However, the fixing of punishment for crime is a legislative and not a judicial function. Punishment for the crime of murder in the second degree is imprisonment in the penitentiary for not less than ten years. Section 559.030 RSMo 1949, V.A.M.S. The punishment assessed against defendant, being within the limits fixed by the statute, cannot be held to be cruel or unusual. State v. Nord, Mo., 286 S.W.2d 775, 776; State v. Burnett, 365 Mo. 1060, 293 S.W.2d 335, 344.

The indictment duly charges defendant with the crime of which she was convicted. She was personally present and represented by competent counsel throughout all stages of the trial and after-trial proceedings. The verdict is in due form and the punishment is within the limits fixed by law. Allocution was granted and the judgment and sentence imposed is in accord with the verdict and constitutes a valid and binding judgment.

The judgment is affirmed.

All concur.