**STATE of Missouri, Respondent,**

v.

**Virginia STRONG, Appellant.**

**No. 47944.**

Supreme Court of Missouri,

Division No. 1.

Nov. 14, 1960.

T. A. Shockley, Waynesville, for appellant.

John M. Dalton, Atty. Gen., Richard R. Nacy, Jr., Sp. Asst. Atty. Gen., for respondent.

DALTON, Judge.

By an information filed in the Circuit Court of Texas County the defendant

was charged with murder in the first degree of one Wesley Johnson. The cause went on change of venue to Phelps County where defendant was convicted of murder in the second degree and her punishment assessed at imprisonment in the state penitentiary for a term of 50 years. See Sections 556.220, 559.020 and 559.030 RSMo 1949, V.A.M.S. She has appealed, but has not favored us with a brief. We shall, therefore, examine the assignments of error set out in her motion for a new trial. Supreme Court Rules 27.20 and 28.02, 42 V.A.M.S.[1]

The first assignment is that "the court erred in refusing to sustain defendant's motion for a directed verdict at the close of all of the evidence of first and second degree murder." The motion further states that the evidence was "wholly insufficient to sustain a verdict of second degree murder"; and that, "under all the evidence, defendant could only have been guilty of manslaughter by reason of criminal negligence." A review of the evidence favorable to the State and the verdict of the jury is required.

Defendant, age 28 years, resided with her ex-brother-in-law LeRoy Hudson, and a 16-year old girl (Wilma Jean Dobbs) in what is referred to as the Old Oak Grove Schoolhouse in Texas County, located about four miles from Cabool, on the farm of defendant's mother. About a year previous to the date of the offense in question, while defendant was imprisoned in the county jail at Houston, Missouri, she became acquainted with Wesley Johnson (hereinafter referred to as Johnson, or the deceased) who was also imprisoned in the same jail.

Defendant testified that she had previously been convicted of "fighting and disturbance of the peace" and twice for breaking jail, once when she assisted another woman to break out of jail and once when her "boy friend broke her out of jail. * * * Anyway, I had two jail breaks against me."

It does not appear which sentence she was serving when she met Johnson, but shortly after she was paroled from her last imprisonment and Johnson was released from custody, they "started going together * * * began to keep company." He would come out to her place, "Well, usually, about every weekend," or she would go to St. Louis, so they would be together.

On Friday, May 15, 1959, Johnson came to Cabool and had been at defendant's home a week and one day when he was shot. He "hadn't been doing anything except staying at her home," until Saturday, May 23, 1959. On that morning he went to Cabool "to pick up his check from St. Louis," and, according to defendant, when he returned about 2 p. m. "he had been drinking pretty much." Nevertheless, later that afternoon, defendant, Wilma, Hudson and Johnson returned to Cabool. Johnson "wanted to go dancing," but defendant said he was drunk and she told him, "you go your way and I'll go mine." Defendant and Wilma then separated from the others and went to Mountain Grove and did not return to Cabool until about 8 p. m. Later they went to Tiny's Steak House in Cabool. The State's evidence covers a period of time beginning about 11:30 p. m. May 23, 1959, until Johnson's death in the early morning hours of May 24, 1959.

About 11:30 p. m. Saturday May 23, 1959, State's witness, Jack West, saw defendant and Wilma alone in front of Tiny's Steak House and he offered to take them out to their home southwest of Cabool in his father's car. They consented and all went out and remained for a short visit, but, presently, defendant wanted to return to Cabool to look for Johnson and, accordingly, West, Wilma and defendant returned to Cabool. Driving around in Cabool, they located Johnson, who was still somewhat intoxicated. Defendant asked him to get in the car and he repeatedly said "No", but finally entered the car and sat in the rear seat alone. The other three rode in

1. Now Crim. Rules 27.20, 28.02, V.A.M.R.

the front seat as they returned to defendant's home. On the return trip, defendant accused Johnson of leaving her and he accused her of leaving him. Defendant also accused Johnson "of writing a check that wasn't any good." She said she "went and picked the check up and paid for it." The conversation was "argumentative." When they reached defendant's home, all went in the house and were seated, except defendant, who stood arguing with Johnson, and "there was some rather harsh words said." The "no good check", which defendant said she had paid "was laying on the table." Both defendant and Johnson were "reasonably mad * * * provoked, at least." Defendant "told him she didn't want him writing these checks and her a-having to take them up." Defendant "made mention of a gun and Johnson said, 'Go get the gun.'" Defendant went to the back corner of the room and got a gun (a rifle, .22 caliber, "pump gun"). When she went for it, she "walked rather hurriedly; not exceedingly fast." When she returned, she remained standing and "just held it (the gun) in his (Johnson's) general direction." Johnson remained seated on a bench at a table near the door, defendant was seven or eight feet away, and the argument continued. Defendant said to Johnson, "I will kill you" and Johnson said, "Go ahead." Later, defendant again said, "I will kill you" and Johnson said, "Go ahead, I'm no good anyway. You'll have to suffer for it." He told her on two or three occasions to go ahead and shoot him. West then told defendant to put up the gun, but the argument continued and a shot was fired. Thereupon, Johnson raised his leg and said: "God damn, woman, right through the britches leg. What in the hell is the matter with you?" Thereafter, the argument about the check continued and West walked over, reached out his hand and told defendant to put up the gun, or give it to him. West also said to her: "Don't go shooting him * * * you'll suffer for it, or you'll go to jail. Don't do it. * * * Give me the gun." Defendant made no response, but "She had the gun pointed in his (John-son's) direction," in his "immediate direction." She "just continued arguing, and then she shot again."

West further testified: "I was watching the gun, yes, but I did not see her attempt to put it on safe * * * the trigger finger was in the gun, in the trigger guard * * * I'm positive she did not attempt to put it on safety." She did not have the gun at her shoulder. West had just been talking to her and was about 6 feet away, she was standing about 7 feet from Johnson, who was still seated. When the shot was fired, Johnson raised up from the bench he was seated on and said, "Take me to the doctor, quick," and started to fall and West grabbed for him. There was blood on his chest. Defendant threw the gun down and ran over and sat down in a chair and started crying. Johnson was then placed in the back seat of the car and all returned to Cabool. Defendant rode in the back seat with Johnson and was talking to him and West heard her saying, for the first time, that she didn't mean to hurt him. When the parties arrived at Cabool, Johnson was dead. His body was lying in the back seat of West's car, when it was examined by the Coroner of Texas County. A bullet wound was observed in the right side of his chest, also there was a hole in his shirt and a hole in his right pant leg. Defendant told the coroner that she and Johnson had been arguing and she shot him.

Edward D. Elmore, a member of the State Highway Patrol, arrived at Cabool about 1:30 a. m., May 24, 1959, and defendant told him that she shot Johnson. She said they got into an argument and she was mad at him and he asked her to shoot him. The squabble started over a "hot check" that she had picked up. She said that she had picked up several checks previous to the one in question; and that Johnson was supposed to pick her up that day and he didn't arrive. She said Johnson was seated at the table when she shot him. She later told witness the same thing, to wit: "They got into an argument over those checks and him not be-

ing there where he was supposed to be to pick her up at the right time."

About 1 a. m. on the morning of May 24, 1959, defendant told Wayne Rust, night policeman at Cabool, that she shot deceased. On the same morning, Patrolman Robert T. Gooch went to defendant's home and recovered "a slide action .22 caliber rifle." It was lying on the floor 15 feet back from the front door. There was one expended cartridge in the chamber. There was a kerosene lamp, a box of crackers and a bottle of whiskey on the table. Witness also observed a bullet hole on the wall near the baseboard, 6 or 7 inches above the floor and right beside the door.

About 8 a. m. on the morning of May 24, 1959, defendant told the jailer (Len Wilson) at Houston, "I shot Wesley Johnson." Witness further testified: "She was crying and said she was pretty bad upset; said they'd been a-having trouble over a check, she's getting tired of picking up checks that he had wrote."

Paul Howard Beckman, a physician, performed an autopsy on deceased's body. He testified that "there had been an entrance of a small blunt object * * * someplace just to the right of the sternum, missing both the ribs and sternum. The bullet coursed from there slightly downward and toward the midline to emerge at a point just under the surface of the skin in the back, at the level of about the sixth thoracic vertebra. * * * The bullet definitely did penetrate the pericardial sack, or the sack around the heart, and a portion of the right wall of the heart or the muscle part of the heart." Johnson's death was "due to massive sudden shock of blood loss from the bullet penetrating the heart and great vessels from the heart."

Defendant's evidence tended to show that on the day in question defendant paid off a "hot check" the deceased had given at Tiny's Steak House; and that, when Johnson was located and taken to defendant's home, he was "highly intoxicated." As to what transpired after the parties returned to defendant's home, and prior to the second shot, the defendant's evidence conformed rather closely to that of the State. However, defendant testified that on the way home with Johnson, she "was pretty nervous because he'd wrote this check, and Jack was driving pretty reckless" and she said to Johnson, "How come you to be writing hot checks again?", and Johnson denied that he had written any such checks; and that, after they were back at her home, they stopped and had some drinks in the car, a bottle of Vodka.

After they were out of the car she carried in some flowers from the car and Johnson was seated at the table with his head down and without looking up he said, "Honey, why don't you blow my damn brains out, I'm no good." She said she replied, "I just may do that." She further testified that the last time he said "Go get the gun and shoot me" she put down some flowers she was carrying and got the gun; that after she fired the first shot she took the rifle and "pulled up on it and the empty shell fell out" and she let it back down; that she "was holding the gun in one hand", and that, when Jack (West) ran over there and said, "Jenny, put that gun down, you're going to kill somebody", she replied, "Oh, Jack, I know what I'm doing", and that's when she raised the gun to put it on safety. She didn't know how it went off the second time. She wasn't pointing it at Johnson. She merely raised her hand to put her finger "on the safety thing by the trigger there"; and that she was attempting to put the gun on safety, when the gun went off. "I was looking for this little thing (indicating), and that's when the gun went off." At no time did she aim the gun at Johnson. She knew she didn't pull the trigger, except the one time she shot through his britches leg. As to that shot, she said that she asked him where he wanted her to shoot him and he said, "If you want to shoot me to kill me shoot me in the toe." And that's when he raised his leg, and that's when she shot between his legs. She testified: "We both

laughed at that." She also testified: "We were playing and he said to shoot him through the toe if I wanted to kill him, and I thought, well, if I did shoot through the britches leg, or between his legs, it would scare him." She said that her story disclosed "exactly how he came to his death." She denied that she ever stated that she got mad and shot him.

In rebuttal, the State's evidence showed that a member of the State Highway Patrol had tested the gun by firing five .22 shorts and five .22 longs and that there was no malfunction in the weapon at all; that it had a bolt safety behind the trigger guard; that to place the safety off and make the gun ready for firing you moved the pin to the left; and that to place the gun on safety you moved the pin to the right.

At the close of all the evidence the defendant moved "for judgment of acquittal for the reason the evidence does not support the charge herein and for the further reason that the defense has proved the alleged killing was an accident and the State has failed to prove that said killing was not an accident." See Supreme Court Rule 26.10.[2] The motion was denied.

As stated, no brief has been filed in this court by defendant, but the above motion and paragraphs four and five of defendant's motion for a new trial disclose the grounds of her contention that the court erred in not directing a judgment of acquittal at the close of all the evidence.

In paragraph four of the motion for a new trial defendant says that the testimony of the State's only eyewitness (West) was to the effect that "when the second shot was fired, the defendant was not aiming the gun at the deceased, and that she was holding the gun down to her side, and not in a position to fire the gun mentioned in evidence." Defendant misconstrues the testimony of witness West which was to the effect that defendant, while not holding the rifle to her shoulder, was continuously holding it in such a position that it was pointed directly at the deceased, in his "immediate direction." In paragraph five of defendant's motion for a new trial, the defendant contends: "That the evidence of the defendant, Virginia Strong, clearly shows that the shooting and killing of the deceased was an accident, and that after her testimony the burden of proof shifted to the State to prove that the homicide was not an accident, and the State failed to prove said killing was not an accident and in fact, made no attempt whatever to disprove the accident theory of the case."

■ The court instructed the jury on murder in the first degree, on murder in the second degree and on manslaughter by reason of criminal negligence. As stated, defendant's motion for a new trial in effect concedes the sufficiency of the evidence to make a submissible case of manslaughter by reason of criminal negligence. If the evidence was sufficient to make a submissible case of manslaughter, the motion for judgment of acquittal was properly overruled, since the offense of manslaughter was included in the charge of murder in the first degree. State v. Vincent, Mo.Sup., 321 S.W.2d 439, 441; Section 556.220 RSMo 1949, V.A.M.S. However, we shall determine the sufficiency of the evidence to submit the issue of murder in the second degree, the offense of which appellant was convicted.

■ In testing the sufficiency of the evidence in a criminal prosecution by motion for judgment of acquittal, the facts in evidence must be considered in a light most favorable to the State. State v. Lawrence, Mo.Sup., 280 S.W.2d 842, 846(2). We must consider as true the evidence favorable to the State and the favorable inferences reasonably to be drawn therefrom and disregard all evidence and inferences to the contrary. State v. Benjamin, Mo.Sup., 309 S.W.2d 602, 604; State v. Stehlin, Mo.Sup., 312 S.W.2d 838, 839(2).

■ Murder in the second degree is defined as the killing of a human being will-

2. Now Crim.Rule 260.10, V.A.M.R.

fully, premeditatedly and with malice aforethought, but without deliberation. State v. Archer, Mo.Sup., 328 S.W.2d 661, 665; State v. Vincent, supra. The evidence which has been reviewed, when considered in a light most favorable to the State, is clearly sufficient to support a finding of every essential element of murder in the second degree. Consequently, the trial court did not err in overruling defendant's motion for a judgment of acquittal filed at the close of all of the evidence.

■ The only specific ground urged in support of defendant's motion for judgment of acquittal and in the motion for a new trial is on the theory of accident, to wit, that the State failed "to prove that the homicide was not an accident." That issue turned upon the credibility, weight and value of defendant's testimony as against the testimony of the State's witnesses and the reasonably favorable inferences to be drawn therefrom. The burden was always on the State to prove every essential element of the offense of which defendant was convicted. The evidence of the State was sufficient to discharge that burden. Defendant's theory of accident was clearly controverted by the State's evidence. The cause was properly submitted to the jury. State v. Tourville, Mo.Sup., 295 S.W.2d 1, 5.

■ Error is assigned on the giving of Instruction 1 submitting murder in the first degree and on the giving of Instruction No. 2 submitting murder in the second degree. It is alleged that there was no evidence to sustain a conviction for either first degree murder or second degree murder. Since defendant was not convicted of first degree murder we need not determine whether a conviction for murder in the first degree would have been sustained or whether the evidence supported the giving of Instruction No. 1. A defendant who has been convicted only of murder in the second degree may not successfully urge error in the giving of an instruction on murder in the first degree, even if the instruction is not suffi-

ciently supported by evidence. State v. Mayberry, Mo.Sup., 272 S.W.2d 236, 242 (16); State v. Rodgers, Mo.Sup., 102 S.W. 2d 566, 568(7); State v. Sterling, Mo.Sup., 72 S.W.2d 70. The error, if any, was not prejudicial. State v. Ellis, 290 Mo. 219, 234 S.W. 845; State v. Ashbrook, Mo.Sup., 11 S.W.2d 1037, 1039.

■ It is further contended that the punishment assessed is excessive under the evidence. The fifty-year term was within the limits of punishment provided by the Legislature for murder in the second degree: " * * * those convicted of murder in the second degree shall be punished by imprisonment in the penitentiary not less than ten years. " Sec. 559.030 RSMo 1949, V.A.M.S. It was the jury's function primarily to assess defendant's punishment within the statutory limits, subject to the trial court's discretionary power to reduce the punishment so assessed. State v. McHarness, Mo.Sup., 255 S.W.2d 826, 829(4); Sec. 546.430 RSMo 1949, V.A.M.S.

■ In the final paragraph of the motion for a new trial, defendant charges that the jury trying her case was biased and prejudiced against her and gave her an excessive sentence as a warning to all wives, including the wives of the jurors, that they should not shoot their husbands. The motion recites that it was common knowledge that, shortly before the trial of defendant's cause, one Jane Pinkston had been convicted in Phelps County and given a sentence of thirty-five years for shooting and killing her husband. We find nothing in the record on appeal to sustain any of the allegations of this final assignment in the motion for a new trial. Such allegations do not prove themselves and no evidence was offered in support of these assignments. State v. Adams, 318 Mo. 712, 300 S.W. 738, 742 (11); State v. Coleman, Mo.Sup., 300 S.W. 673; State v. Franks, 339 Mo. 86, 95 S.W.2d 1190, 1192(5); State v. Jordan, 353 Mo. 405, 182 S.W.2d 563. The punishment assessed, in and of itself, does not demonstrate

the passion and prejudice of the jury. State v. McHarness, supra.

The information was sufficient in form and substance to charge defendant with murder in the first degree and the evidence was substantial in supporting the verdict and finding of the jury as to murder in the second degree. The verdict was responsive to the charge in that the jury found the defendant guilty of an offense inferior to and of lesser degree to that charged in the information. See Sec. 556.220 RSMo 1949, V.A.M.S. Defendant was granted allocution and judgment and sentence were duly pronounced.

Finding no error in the record the judgment is affirmed.

All concur.