**STATE of Missouri, Respondent,**

v.

**Alvin Charles WOODARD, Appellant.**

**No. KCD 26371.**

Missouri Court of Appeals, Kansas City District.

Sept. 4, 1973.

Willard B. Bunch, Public Defender for the 16th Judicial Circuit, Kansas City, for appellant.

John C. Danforth, Atty. Gen., David Robards, Asst. Atty. Gen., Jefferson City, for respondent.

Before DIXON, C. J., and PRITCHARD, and SOMERVILLE, JJ.

SOMERVILLE, Judge.

A jury found defendant guilty of murder in the second degree in violation of Section 559.020 RSMo 1969, V.A.M.S. and assessed his punishment at thirty years in prison. Sentence and judgment were rendered accordingly. Sections 559.020 and 559.030 RSMo 1969, V.A.M.S. Defendant duly effected his appeal.

On appeal defendant asserts six counts of error: (1) the state's evidence was insufficent to support a conviction of murder in the second degree; (2) a dying declaration of the victim was excluded; (3) the state's attorney argued punishment for the first time in the final portion of his closing argument; (4) the state was permitted to question one of its own witnesses from an extrajudicial statement, and was permitted to read the extrajudicial statement to the jury at the close of the state's case, thereby depriving defendant the right of cross-examination and confrontation guaranteed by Article I, Section 18(a) of the Constitution of Missouri, V.A.M.S., and the Sixth and Fourteenth Amendments of the Constitution of the United States; (5) the state was permitted to cross-examine and impeach its own witness by means of an extrajudicial statement, thereby prejudicing defendant's right to a fair trial; and (6) the state's attorney, during his closing argument, referred to the extrajudicial statement as constituting substantive evidence to be considered by the jury as proof of the state's case. All of the points raised and briefed by the defendant will be ruled on, seriatim, since defendant's conviction must be reversed and a new trial granted.

Resolve of defendant's first (1) point compels a review of the evidence in the

light most favorable to the state, considering as true all evidence and reasonable inferences favorable to the state and disregarding all evidence and inferences unfavorable to the state. State v. Strong, 339 S.W.2d 759 (Mo.1960), State v. Bruton, 383 S.W.2d 525 (Mo.1964), State v. Archer, 328 S.W.2d 661 (Mo.1959), State v. Colthorp, 437 S.W.2d 75 (Mo.1969) and State v. Watson, 350 S.W.2d 763 (Mo.1961).

■ It is the sole prerogative and function of the jury to weigh and evaluate the evidence and make the crucial determination of whether such evidence proves beyond a reasonable doubt that defendant committed murder in the second degree. Appellate review is limited to determining whether there is sufficient substantive evidence to support the jury's determination. State v. Strong, 484 S.W.2d 657 (Mo. 1972), State v. Crawley, 478 S.W.2d 344 (Mo.1972), State v. Odom, 353 S.W.2d 708 (Mo.1962).

■ The requisite elements of murder in the second degree are willfulness, premeditation and malice aforethought. State v. Randolph, 496 S.W.2d 257 (Mo. banc 1973), State v. Bruton, supra, State v. Strong, 339 S.W.2d 759 (Mo.1960), State v. Archer, supra, State v. Jewell, 473 S.W. 2d 734 (Mo.1971). In the context of murder, State v. Marston, 479 S.W.2d 481 (Mo.1972), p. 484, defines willfulness as "intentionally" or "knowingly", and premeditation as "thought of beforehand for any length of time, however short". In the context of murder, State v. Williams, 323 S.W.2d 811 (Mo.1959), p. 813, defines malice as " 'the intentional doing of a wrongful act without just cause or excuse' ". Absent overt statements by an accused, intent to kill is necessarily subjective. Malice aforethought may be presumed when an intentional killing with a deadly weapon occurs. State v. Hammonds, 459 S.W.2d 365 (Mo.1970). Flight and resistance of arrest may be considered by the jury as evidencing consciousness of guilt. State v. Williams, 382 S.W.2d 597 (Mo.1964), State v. Kilgore, 447 S.W.2d 544 (Mo.1969).

With the above as a legal matrix, evidence most favorable to the state to sustain defendant's conviction for murder in the second degree appears as follows. Shortly before six P.M. on November 13, 1971, defendant entered the Neighborhood Tavern in Kansas City, Missouri. He was observed to be carrying a sawed-off, single shot, breech loading 410 shotgun—an "illegal firearm according to standards of the Federal Government". He was then observed talking to an unknown man, who was facing him, and with the gun pointed toward the unknown man. The bartender of the tavern walked over to defendant and the unknown man and made inquiry of defendant as to what his trouble was and whether anybody was bothering him. Defendant ignored the bartender's inquiries, and continued talking to the unknown man. The bartender then asked a waitress at the tavern to call the police, which she did. A short time later, defendant was seen talking to Larry McNeil, the decedent (also defendant's brother-in-law), while both were standing at the bar. Defendant had the gun in his hand when he approached the decedent. The conversation between defendant and decedent lasted approximately four or five minutes. The conversation between the two was apparently subdued because the bartender, who was approximately twenty feet away, did not hear what was said between the two. During the conversation the bartender had his back to defendant and decedent, checking the cash register. At the conclusion of the four or five minute conversation, the bartender heard a shot. The bartender turned and observed that the decedent had been shot and that defendant was walking toward the front door of the tavern with the gun in his hand. The decedent sustained a massive and fatal wound in his right groin and death occurred approximately seven days later. As defendant approached the front door of the tavern, a police officer entered with a drawn weapon.

The officer told everyone to "freeze", whereupon defendant grabbed Dolly Farris (his sister and an employee of the tavern) by the neck and, using her as a shield, backed to a door in the rear of the tavern which lead to a utility room. While backing toward the door, defendant had the gun over his sister's shoulder, pointed toward the police officer. When the defendant got in close proximity to the door, he released his sister and ran through the door. The police officer attempted to talk defendant into coming out of the utility room, and failing to do so, then tried to flush defendant out by firing four or five shots, also to no avail. The tavern was then cleared of patrons and employees and tear gas was used. Approximately forty-five minutes later defendant was found unconscious underneath a corner of the bar. At the time the 410 shotgun, loaded, was in defendant's possession.

■ The evidence set forth, if believed by the jury, was sufficient to support a finding by the jury of all the requisite elements of murder in the second degree. Entering the tavern with a loaded sawed-off shotgun, engaging decedent in conversation for approximately five minutes with the gun pointed toward him, and the resultant discharge of the gun and fatal wounding of decedent, constituted a sufficient basis for the jury, to infer that defendant willfully, premeditatedly and with malice aforethought shot and killed decedent. Collaterally, the jury was entitled to evaluate and place in proper perspective defendant's conduct after the police arrived. Defendant's contention that the state failed to make a submissible case of murder in the second degree is ruled against him.

■ Resolve of defendant's second (2) point necessitates delineation of certain additional evidence. Defendant sought to hurdle the hearsay rule on the theory that a purported statement by the decedent constituted a dying declaration. Principles of law determinative of the admissibility or non-admissibility of purported dying declarations are well drawn in Missouri. However, like most principles of law, their controlling applicability is seldom susceptible of easy or quick determination. To be admissible, a dying declaration must have been made by the declarant in extremis "in the belief on the part of the declarant of impending death, after hope of recovery has been abandoned." State v. Custer, 336 Mo. 514, 80 S.W.2d 176, 177 (Mo.1935). See also State v. Davis, 337 Mo. 411, 84 S.W.2d 930 (1935) and State v. Proctor, 269 S.W.2d 624 (Mo.1954). Belief of "impending death" and abandonment of "hope of recovery", both of which are conditions precedent to the admissibility of a dying declaration, are necessarily subjective, and, hence, fall into a category that is (1) difficult to prove, and (2) even more difficult to ascertain. There are, however, recognized methods of proving the declarant's state of mind as to the required subjective elements, the strongest, undoubtedly, being express statements by the declarant, but, additionally, by showing the nature and extent of the inflicted wounds, statements of attending physicians made to and acquiesced in by declarant, the length of time elapsing between the making of the declaration and death itself, the administration of "last rites", and last, but by no means least, the conduct of declarant and any and all other circumstances that reveal his apprehension of impending death and abandonment of hope for recovery. State v. Livingston, 204 S.W. 262 (Mo.1918) and State v. Proctor, supra. Summarized, unless declarant makes express statements disclosing his state of mind, both as to belief of impending death and abandonment of hope of recovery, objective facts must be shown from which declarant's state of mind, both as to belief of impending death and abandonment of hope for recovery, may be reasonably inferred.

■ Dying declarations are as admissible to exonerate an accused as they are to convict, and rightly so. State v. Livingston, supra. It is not necessary for

death to immediately follow the declaration. State v. Brandt, 467 S.W.2d 948 (Mo.1971).

Determination of whether satisfactory proof exists as to declarant's state of mind regarding both belief of impending death and abandonment of hope for recovery is a preliminary matter for the trial court. If such preliminary determination is resolved by the trial court in the affirmative, the dying declaration is admitted into evidence and the jury, under proper instruction by the trial court, ultimately resolves declarant's state of mind existing at the time the declaration was made. State v. Custer, supra.

Turning now to the relevant evidence, and testing same in the context of the above established principles, the record discloses that following the shooting decedent underwent surgery and regained consciousness early on the following morning at which time he engaged in conversation with his wife, Ann McNeil (also defendant's sister). Decedent's death occurred approximately six days later. During the conversation the following colloquy occurred according to the testimony of Ann McNeil:

"Q  Mrs. McNeil, returning to where you are in the room and your husband is back from the operating room. Is that right?

A  Yes.

Q  You had some conversation with him?

A  Yes.

Q  Did he make any statement to you at that time with respect to his physical condition?

A  Yes.

Q  And would you tell the Court and jury what it was he said about himself?

A  He wanted some water, and he said he felt as if he was swallowing his tongue.

Q  Were any remarks made to you about God and so forth?

(STATE'S ATTORNEY)  I am going to object to leading the witness, your Honor. Of course it does no good.

THE COURT: I'll sustain it as to the form of the question.

Q  (Defendant's counsel)  Were there any further remarks made by him regarding his state of mind?

A  Yes.

Q  What were those?

A  Well, after he asked for the water, when he asked me to take some cloth and just drop some water in his mouth because he felt as if he was swallowing his tongue, and I told him he couldn't do that—that I couldn't do that because he wasn't supposed to have the water. And I told him to ask God to help him, and he said, 'Oh, God, please help me.'

Q  Subsequent to that incident did you have any further conversation?

A  Yes."

Immediately following the last question and answer Ann McNeil was asked, "Did you have occasion to ask your husband, Mrs. McNeil, whether or not the shooting had been an accident", to which the state objected, and which objection was sustained by the trial court. Defendant contends that the witness, if allowed to answer, would have testified that her husband told her the fatal shooting was an accident. The trial court, in sustaining the state's objection, obviously concluded that the requisite subjective elements for admitting the otherwise hearsay statement as a dying declaration, both as to belief of impending death and abandonment of hope for recovery, were not sufficiently proven by the foundation laid by defendant. The vortex of the matter appears to be declar-

ant's statement, "Oh, God, please help me". Such emanated from circumstances disclosing that decedent wanted his wife to drop some water in his mouth because he felt "he was swallowing his tongue". His wife denied the request "because declarant was not supposed to have water". Thereupon his wife sought to alleviate his physical discomfort by suggesting that he "ask God to help him", which suggestion he took and said, "Oh, God, please help me." The latter, particularly in view of the lack or brevity of other surrounding circumstances from which his belief of impending death and abandonment of hope for recovery might reasonably be inferred, appears equally, if not more, susceptible to the connotation that he was taking his wife's suggestion to obtain relief for his physical discomfort, rather than the connotation that he believed death was imminent and he had abandoned hope of recovery. The trial court, in view of the sparse record, did not commit error in precluding the jury from considering the purported dying declaration.

Since defendant's conviction must be reversed and the case remanded for a new trial, as hereinafter disclosed, it is appropriate to point out that defendant's liberty may, figuratively speaking, be suspended by the "fine thread" of whether the purported statement of decedent is admissible as a dying declaration. Perforce, its exclusion may be a determinative factor in depriving defendant of his liberty. If defendant comes forth with additional facts and circumstances from which to reasonably infer a different connotation to decedent's plea to God and as to the state of decedent's mind as to belief of impending death and abandonment of hope of recovery, the admissibility of decedent's purported dying declaration might well take on a different posture and one not bound, factually, by the instant ruling.

Defendant cites four cases in support of his third (3) point predicating error on the state's attorney arguing punishment for the first time in the final portion of his closing argument. Shaw v. Terminal Railroad Ass'n of St. Louis, 344 S.W.2d 32 (Mo. 1961), State v. Peterson, 423 S.W.2d 825 (Mo.1968), State v. Wadlow, 450 S.W.2d 200 (Mo.1970) and State v. Fair, 467 S. W.2d 938 (Mo.1971). These cases support defendant's contention insofar as they hold that the state in the opening portion of its closing argument must sufficiently make all points known to defendant at that time in order that he may have the opportunity to answer them, and failure of the state to do so ordinarily precludes the state from arguing different or additional points in the final portion of its closing argument. The applicable standard for determining whether error exists when the aforementioned is transgressed was succinctly spelled out in State v. Peterson, supra, at p. 831 of 423 S.W.2d:

> "(W)hether a fair statement of the State's position has been made in some manner in its opening argument; whether any waiver has been made by the defendant, either by his counsel's own argument or by the failure to object properly and to preserve the point; *and, lastly, a determination of the question of prejudice in view of all the circumstances."* (Emphasis added.)

In State v. Peterson, supra, the court additionally pointed out that the question of error would "be ruled in each case on its own particular facts" consistent with the standards prescribed.

In the instant case the state's attorney clearly argued punishment for the first time in the final portion of his closing argument. The argument referred to found expression in the words, "If you decide on Murder, Second Degree I ask that you assess his punishment at fifty years in the state penitentiary". Counsel for defendant immediately objected and the objection was sustained by the trial court. Additionally, the trial court told the state's attorney (which was not objected to or questioned by defendant's counsel) to advise the jury to disregard the objectionable

portion of the state's closing argument. The state's attorney advised the jury as instructed by the trial court. Defendant did not move for a mistrial and the objectionable argument was not repeated. It is evident that the instant case is factually distinguishable from Shaw v. Terminal Railroad Ass'n of St. Louis, supra, State v. Peterson, supra, State v. Wadlow, supra, and State v. Fair, supra, relied on by defendant, for in each of the cited cases the objections lodged were overruled. It is pertinent to point out that the defendant in the instant case did not move for a mistrial, but limited the relief he sought to nothing more than an objection, which was sustained by the trial court and the jury was instructed to disregard the objectionable argument. In other words, defendant, who was represented by able counsel, obtained all the relief he sought and made known to the trial court. Although defendant claims in his motion for a new trial and on appeal that the trial court erred in not sustaining his motion for a mistrial because of the objectionable argument, such contention is not supported by and is at odds with the relief defendant sought at the time the argument occurred. State v. Shannon, 413 S.W.2d 198 (Mo. 1967), the "propriety" of which was not questioned in State v. Peterson, supra, held that the "argument of punishment in final argument when not mentioned in the state's opening presentation is not 'plain error'". To properly preserve alleged error for appellate review, assertion of the claimed error in the motion for new trial and in the brief must be based upon assertion of the claimed error and the relief sought at the time the error occurs. State v. Brookshire, 353 S.W.2d 681 (Mo.1962), State v. Slaten, 252 S.W.2d 330 (Mo.1952) and State v. Washington, 320 S.W.2d 565 (Mo.1959). Inasmuch as defendant obtained all the relief which he sought at the time the objectionable argument occurred, coupled with the fact he failed to move for a mistrial, such stand to preclude any present claim of error regarding the objectionable argument. This ruling should not be construed as condoning the argument. It was clearly improper. The state by arguing punishment for the first time in the final portion of its closing argument went to the very brink of trial disaster.

■ The basis for defendant's fourth (4) point springs from the State's examination of Dolly Farris, one of its own witnesses. She testified she was a sister of defendant, a sister-in-law of decedent, and was working in the Neighborhood Tavern at the time of the fatal shooting. Although she was unable to recall the precise time, she did recall that both defendant and decedent were in the tavern on the day in question. She could not remember whether defendant and decedent were "together" in the tavern. When the fatal shooting occurred, she heard the shot but did not see what occurred. After hearing the shot, she suspected decedent had been shot because he was "limping". She could not remember whether another brother had an argument with defendant in the tavern. She was grabbed from behind by a person she could not identify and taken towards a door in the rear of the tavern. At this juncture, defendant's counsel objected to leading questions propounded by the state to its own witness. The court stated, out of the presence of the jury, that he observed "great hostility" on the witness's part and overruled the objection. The state's examination of Dolly Farris continued and she testified that she had been drinking throughout the day in question and was drunk, and such accounted for her inability to recall events. She further testified that she could not recall defendant having an argument with one of his brothers in the tavern. Nor could she recall being at the police station at approximately ten P.M. the night of and following the fatal shooting.

At this juncture, State's Exhibit No. 1, later identified as a typed statement prepared by detective John King of the Kansas City Police Department recapitulating answers made by Dolly Farris to questions

propounded by him, and which he said was signed by Dolly Farris, was marked for identification. The state then proceeded to ask Dolly Farris if the signature affixed to Exhibit No. 1 was hers, to which she replied it looked like her signature but she couldn't recall having signed the statement. The state, over objection of the defendant, then proceeded to impeach Dolly Farris, its own witness, by questions incorporating portions of the statement (the legal propriety of the state impeaching its own witness being separately raised by defendant in his fifth point). Quoting from State's Exhibit No. 1, the state asked Dolly Farris if she recalled telling detective King the following:

"Q (By State's Attorney) All right. Then do you recall that at that same time and date you stated, 'As I got to the front door A. C. and my other brother, Arnett Alexander, were arguing and A. C. had a gun pointed at Arnett and I thought he was going to shoot Arnett'? Do you recall making that statement?

A No.

Q Do you recall saying that 'A customer came up to the bar and ordered some beer, and words were exchanged between him and A. C. but I don't know what was said. I saw A. C.'s hand down by his belt, and I told him not to move. This man tried to talk to A. C. and calm him down but A. C. told him to shut up'? Do you recall making that statement?

A No, I don't.

Q Do you recall saying that 'At about this time my brother-in-law, Leroy McNeil, walked towards A. C. and I heard him trying to calm A. C. down. I turned to fill an order, and I heard a shot and I turned back and saw Leroy slumped over'? Do you remember making that statement?

A No, I don't.

Q And do you recall that you said, 'I heard the policeman say to drop the gun, and after he said this A. C. grabbed me from behind and started pulling me down the bar toward the rear of the tavern'? Do you recall saying that?

A No, I don't."

On cross-examination by defendant's counsel Dolly Farris stated that at defendant's preliminary hearing she testified, under oath, that she could not recall any statements purportedly made to the police because she was intoxicated at the time. She was additionally asked on cross-examination by defendant's counsel if she wasn't so drunk the night in question that she "could hardly stand up" to which she replied, "I guess so."

The state closed its case by reading Dolly Farris's extrajudicial statement to the jury. Instruction No. 7, paraphrased, told the jury that the extrajudicial statement given by Dolly Farris could not be considered as substantive evidence, but only for purposes of impeachment.

Defendant legally posits his argument that the state's questioning of Dolly Farris from her extrajudicial statement, and the reading of the statement to the jury, denied him the right of cross-examination and confrontation guaranteed by the Sixth Amendment of the Constitution of the United States and Article I, Section 18(a) of the Constitution of Missouri, upon the premise that her failure to recall making the statement is tantamount to making her available for cross-examination and confrontation. Defendant relies upon Pointer v. State of Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), Douglas v. State of Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and certain Missouri decisions hereinafter delineated, to support his position. Careful analysis of the federal authorities cited by the defendant becomes imperative and such will be done chronologically. Although not cited by defendant, Nelson v. O'Neil, 402 U.S.

622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971) demands the same analysis.

The marrow of the confrontation clause in the Sixth Amendment is the right of cross-examination. Pointer v. State of Texas, supra, stands for the proposition that the Fourteenth Amendment makes the Sixth Amendment applicable to state court proceedings. In Douglas v. State of Alabama, supra, a confederate of Douglas was called as a witness by the state. The confederate invoked the Fifth Amendment and refused to answer any and all questions, including a series of questions based on an extrajudicial statement attributed to the confederate which implicated Douglas. Under Alabama law extrajudicial statements could not be used as substantive evidence, but only for purposes of impeachment. The state also called three law enforcement officers who identified the extrajudicial statement as a confession made by the confederate. In essence, the Supreme Court of the United States held that by invoking the Fifth Amendment the confederate, for all practical purposes, was unavailable for cross-examination, thereby violating defendant's right of cross-examination and confrontation guaranteed by the Sixth Amendment. Implicit from the court's opinion is the basic conclusion that constitutional requirements are met if both the maker and taker of an extrajudicial statement are subject to cross-examination and confrontation. The court, with acuity, pointed out that even though portions of the statement contained in and forming various questions posed did not technically constitute evidence, nevertheless "the jury might improperly infer both that the statement had been made and that it was true". In Bruton v. United States, supra, Bruton and a codefendant were jointly tried in the District Court for the Eastern District of Missouri. A witness called by the Government testified as to an oral confession made by the codefendant which also implicated Bruton. The codefendant did not take the stand as a witness. Under the authority of Douglas v. State of Alabama, the court held that the maker of the extra-

judicial statement was unavailable as a witness and therefore Bruton was denied his constitutional right of cross-examination and confrontation. Nelson v. O'Neil, supra, reached the Supreme Court of the United States by way of O'Neil seeking federal habeas corpus relief. O'Neil was tried in the state court of California jointly with a codefendant. At the trial a police officer testified as to an oral confession made by the codefendant which implicated O'Neil. The codefendant took the stand in his own defense and categorically denied the oral confession attributed to him. The Supreme Court reversed the district court's ruling (affirmed by the court of appeals) setting aside O'Neil's conviction in the state court. Particularly germane to the question in the instant case is the fact that the Supreme Court of the United States held that the codefendant's denial of having made the extrajudicial statement did not make the codefendant unavailable for cross-examination and confrontation as mandated by the Sixth Amendment. Since both the maker and taker of the extrajudicial statement were available for cross-examination and confrontation, the facts did not fall within the controlling purview of Douglas v. State of Alabama, supra, and Bruton v. United States, supra. Characterizing as dictum certain language in Douglas v. State of Alabama, supra, stating that effective cross-examination and confrontation was "possible only if the witness affirmed the statement as his", the Supreme Court in Nelson v. O'Neil, 402 U.S. at 627–628, 91 S.Ct. at 1726, said:

"Of course, a witness *can* be cross-examined concerning a statement not 'affirmed' by him, but this dictum from Douglas was repeated in Bruton, supra, 391 U.S., at 127, 88 S.Ct. at 1623. In Douglas and Bruton (and in the other confrontation cases before Green [California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489]) there was in fact no question of the effect of an affirmance or denial of the incriminating statement, since the witness or codefendant was in

each case totally unavailable at the trial for any kind of cross-examination." (Emphasis in the original.)

In the context of availability for cross-examination and confrontation, it is difficult to perceive any practical difference between denial of an extrajudicial statement and lapse of memory as to an extrajudicial statement where both the maker and taker of the same are witnesses at the trial and subject to cross-examination and confrontation. If there be any difference, it is, at most, cosmetic.

Under the authority of Nelson v. O'Neil, supra, defendant in the instant case was not deprived of his right of cross-examination and confrontation guaranteed by the Sixth Amendment of the Constitution of the United States and Article I, Section 18 (a) of the Constitution of Missouri. State v. Rogers, 473 S.W.2d 710 (Mo. 1971), State v. Harvey, 449 S.W.2d 649 (Mo.1970), State v. Gordon, 391 S.W.2d 346 (Mo.1965), State v. Randolph, 39 S. W.2d 769 (Mo.1931) and State v. Patton, 255 Mo. 245, 164 S.W. 223 (1914), also cited by defendant, can easily be distinguished on their facts from the instant case and therefore do not support defendant's position. In *Rogers* the taker of the extrajudicial statement (state's attorney) was not available for cross-examination and confrontation. In *Harvey* the maker of the extrajudicial statement was available for cross-examination and confrontation, and the court affirmed the conviction. In *Gordon* two of the state's witnesses were sought to be impeached by extrajudicial statements made by them; when questioned concerning the extrajudicial statements they invoked the Fifth Amendment; under the controlling authority of Douglas v. State of Alabama, supra, they were clearly unavailable for cross-examination and confrontation. In *Randolph* the extrajudicial statement of a state witness was held improperly used to refresh the witness's recollection. In *Patton* the state questioned its own witness by reference to his testimony before a grand jury to refresh the witness's recollection without authenticating the purported grand jury testimony. Point four raised by defendant must be ruled against him.

Point five (5) asserted by defendant is very much anent point four asserted by defendant. Up to the juncture of Dolly Farris's testimony when the state was permitted to cross-examine her for impeachment purposes by use of the extrajudicial statement attributed to her, the thrust of her testimony was she couldn't remember. Dolly Farris had not testified to any affirmative facts that aided the defendant. The state could not claim surprise because Dolly Farris's testimony up to the juncture mentioned was entirely consistent with her testimony given at defendant's preliminary hearing. The following principle, "thoughtfully established" and clearly enunciated in State v. Drummins, 274 Mo. 632, 204 S.W. 271, 276 (1918), is patently applicable and the trial court committed prejudicial error in permitting the state to impeach its own witness:

"We held in the case of State v. Bowen, 263 Mo. [279] loc. cit. 280, 172 S.W. 367, that it is not sufficient to warrant a party who puts a witness on the stand, in impeaching such witness (by showing extrajudicial statements contradictory of the testimony of the witness upon the stand), that the witness merely fails or refuses to tell the facts which he had theretofore related extrajudicially or fails to tell all of such facts, but, in order to warrant impeachment in the mode stated, the witness must go further, and by relating wholly contradictory facts become in effect a witness for the adverse side. In the latter event the party calling the witness is entitled to show that he was misled and entrapped by the witness' former words and attitude into calling the adverse witness. He is not so entitled, however, when the witness merely fails to relate facts which the party offering him had been led to believe he would relate."

See also State v. Castino, 264 S.W.2d 372 (Mo.1954), State v. Gregory, 339 Mo. 133, 96 S.W.2d 47 (1936), State v. Kinne, 372

S.W.2d 62 (Mo.1963) and State v. Gordon, 391 S.W.2d 346 (Mo.1965).

The error committed in allowing the state to impeach its own witness was highly prejudicial. It is difficult, if not impossible, to conject that the jury could be expected to and did give the extrajudicial statement attributed to Dolly Farris minimal weight or that they could be expected to and did confine it to impeachment purposes. The more logical conjecture is the jury would and did give heavy weight to the extrajudicial statement attributed to Dolly Farris, especially since it was read to them, and considered it as substantive evidence of proof of the requisite elements of murder in the second degree and of defendant's guilt. The aforementioned conjecture is buttressed by the references the state's attorney made to the extrajudicial statement in the state's closing argument as hereinafter demonstrated.

Resolve of defendant's sixth (6) point necessitates a review of the state's closing argument. The following excerpts from the closing argument of the state's attorney are lifted verbatim from the transcript:

"But on November 13th she told the police, whether it's true or not—and I see no reason to question the truthfulness of her statement to the police that day. She told them her brother was in arguments out there and threatening people with this shotgun, one of them his own brother."

\* \* \* \* \* \*

"Again I'll repeat, whether it is true or not, what she told the police on November 13th, the night of the shooting, is for you to decide. But what reason would she have to lie to the police that day? So she told them A. C. Woodard, this defendant, had threatened two other people, one of them his own brother, another one a man who came to the bar to order some beer. She was afraid for her other brother. She walked him to the corner and then he ran to get away. I assume she thought she wouldn't be shot. The other one—we don't know who the man is."

\* \* \* \* \* \*

"All right. Leroy McNeil came over, by her statement, to try to intercede and calm down this vicious little man with a shotgun who is threatening an innocent man at the bar trying to order a beer, and for this he is shotgunned to death."

\* \* \* \* \* \*

" 'He threatened them,' this kind of thing. It is in evidence for the purpose of showing that Mrs. Farris, due to a memory lapse or whatever reason, now says on the stand she doesn't know anything about this killing. And this statement is in evidence, as was Sergeant King or Detective King, to show you that she did make the statement. Now, whether the facts—

(Defendant's Counsel) : I object.

(State's Attorney)—she talked about were true—"

\* \* \* \* \* \*

"Now, that statement, I have told you before and I'll tell you again, I see no reason why it would have been given if it were not the truth."

█ The above constitute a classic example of letting zeal for a conviction obfuscate all concepts of a fair trial. Whether such argument was contrived or otherwise, the inescapable conclusion is, ·from the standpoint of jury impact, the extrajudicial statement of Dolly Farris was being used as substantive evidence in support of the requisite elements of murder in the second degree. Missouri, in State v. Granberry, 491 S.W.2d 528 (Mo.1973), recently reaffirmed that it hews to the "orthodox" view that extrajudicial statements can only be used for impeachment and not as substantive evidence, therein, at page 530 defining the "orthodox" rule as follows:

" 'The general rule (sic, orthodox) is almost universally recognized that evi-

dence of extrajudicial statements made by a witness who is not a party and whose declarations are not binding as admissions is admissible only to impeach or discredit the witness, and is not competent as substantive evidence of the facts to which such statements relate.' "

The portions of the closing argument of the state's attorney complained of clearly fall within the perimeter of condemnation drawn in State v. Kinne, supra, and State v. Gordon, supra. Every instinct—legal and otherwise—impels the conclusion that the trial court erred in not sustaining defendant's motion for a mistrial because the closing argument of the state's attorney reached the nadir, not the apogee, of even the most basic concept of a fair trial.

Judgment reversed and cause remanded for a new trial.

All concur.