STATE of Missouri, Respondent,

v.

Donald M. BRUTON, Appellant.

No. 50071.

Supreme Court of Missouri,
Division No. 2.

Nov. 9, 1964.

Thomas F. Eagleton, Atty. Gen., O. Hampton Stevens, Asst. Atty. Gen., Jefferson City, for respondent.

Burton H. Shostak, Moser, Marsalek, Carpenter, Cleary & Jaeckel, St. Louis, for appellant.

STORCKMAN, Presiding Judge.

A jury found the defendant guilty of murder in the second degree. Section 559.020 RSMo 1959, V.A.M.S. The trial court heard evidence in chambers and made a finding that the defendant had been convicted of a prior felony. The punishment was therefore assessed by the court and the defendant was sentenced to thirty years in the custody of the Department of Corrections. Sections 556.280 and 559.030. The principal contentions on appeal are that the court erred in overruling defendant's motion for acquittal filed at the close of all the evidence because the evidence failed to show the defendant guilty of second-degree murder, that the court erred in instructing the jury on second-degree murder because there was no evidence to support the submission, and that the court erred in giving instruction No. 5 because it was not a proper statement of the law.

During the evening of August 7, 1962, approximately thirty young men and wom-

en, many of them teenagers, congregated in the Chain-of-Rocks Park, sometimes referred to as Riverview Park, near the municipal waterworks on the bank of the Mississippi River in North St. Louis. They had come in various motor vehicles and had brought with them cold beer in cans which had been purchased at liquor stores by members of the crowd. At the place in question, there were concrete tables and benches about which these young people gathered drinking beer and talking, according to the record. There was also some evidence that there was a fifth of wine on one of the tables. This area of the park was illuminated by streetlights. At about 11:30 p. m., an altercation occurred during which the defendant stabbed Raymond Glon in the chest with a pocket knife. The blade penetrated the right ventricle of the heart. The victim of the stabbing was taken by his companions to a hospital in St. Louis County where he was pronounced dead on arrival at about midnight. There was medical evidence that Glon died as a result of a massive hemorrhage produced by the stab wound.

The defendant testified and admitted that he stabbed Glon but claimed that he was acting in self-defense when he did so. The jury was instructed on second-degree murder, manslaughter, and self-defense. The sufficiency of the evidence to support the conviction of second-degree murder depends on the circumstances under which the stab wound was inflicted. Eleven persons who were present when the altercation occurred testified on behalf of the state. The defendant was the only witness in his behalf.

█ In determining its sufficiency to support a conviction, the evidence must be viewed in the light most favorable to the state. State v. Giden, Mo., 369 S.W.2d 212, 214 [5]; State v. Davis, Mo., 367 S.W.2d 517, 519 [2].

William H. Miller, aged 21, and the defendant Donald M. Bruton, aged 24, double-dated on the night in question and rode in Miller's car. Miller's date was Joan Piper, aged 17, and the defendant was with Ann Harkey, aged 17, who had been going with the defendant "as his steady". The two couples first went in Miller's automobile to the parking lot of the Redwood Restaurant in Ferguson where a number of other young people were assembled. It was here that the larger and later assemblage in Chain-of-Rocks Park was planned. The youngest member of the ill-fated drinking party was a boy 15 years of age and the oldest was 24.

Just prior to the fatal encounter, Raymond Glon was sitting on one of the concrete tables or benches drinking from a can of beer. There was some evidence that he was also drinking wine from a bottle. Ann Harkey had been talking to him at the table. Thereafter, while standing nearby, the defendant and Miss Harkey got into an argument which culminated in the defendant telling her, in substance, if she wanted to go with Glon to do so and to stay away from him. Thereupon, the defendant shoved Ann Harkey towards the concrete table and against Glon causing him to drop his can of beer which went under the table. Glon retrieved the beer, sat back down, and said to the defendant, "Why don't you lay off of her." During his altercations with Ann Harkey and Glon, the defendant applied to each of them vile and filthy epithets which need not be repeated here. For present purposes, it is sufficient to say that the defendant in effect asked Glon whether he was looking for trouble and Glon responded that he did not want any trouble with the defendant. The defendant suddenly lunged at Glon and stabbed him in the chest. All of the witnesses to the encounter except the defendant testified that at the time Glon was stabbed his arms were at his sides with nothing in his hands. John August Beck threw his arms around the defendant, pinning his arms. As he struggled to get free, the defendant shouted to Glon, "I'll kill you and I'll get her later." Ann Harkey ran away and hid in some nearby woods. Glon did not strike at the defendant at any time. After he was stabbed, Glon staggered back

several steps against a tree and finally fell to the ground. He was taken to the hospital by some of his companions. He was unable to make a statement before he died.

After the defendant quieted down and was released by Beck, he, Bill Miller, and Joan Piper looked for Ann Harkey in the park and elsewhere. Then at the defendant's suggestion, Miller drove to a high-wire fence enclosing a pond which was part of the property of the municipal water-works. The defendant wiped blood from the knife which he had used and threw it over the fence. It fell in grass near the pond where it was later found by a police officer. Miller left the defendant at a bar and went home. The next morning Miller received a call from the defendant, met him on a parking lot of a shopping center and took him some clean clothes. After they had something to eat, the defendant went to a barbershop and got a crew cut. Previously he had worn his hair long in a so-called Hollywood style. The defendant then went to his home where he was arrested by the police.

The defendant's testimony tended to corroborate much of the state's case. The chief difference was the defendant's assertion that after he pushed Miss Harkey against Glon causing him to spill his beer, Glon said in effect if he was not the defendant's friend he would "whip his head", that this made the defendant "sort of mad" and he retorted, "Who are you going to whip?" With this Glon jumped up from the table, grabbed a wine bottle, raised it to shoulder height, and made a threatening motion. When Glon did this, the defendant took his knife from his pocket and opened it, where-upon Glon said, if you want to fight with knives, I'll get one too and reached into his pocket. As Glon started to pull his hand from his pocket, the defendant stabbed him. The defendant testified that Glon was of a violent and turbulent nature, but there was no other evidence to that effect. On cross-examination, the defendant admitted that he had pleaded guilty to a charge of assault with intent to do great bodily harm and was

sentenced to imprisonment in the reformatory from which he was released in 1958.

Murder in the second degree is the killing of a human being wilfully, premeditatedly, and with malice aforethought, but without deliberation. State v. Strong, Mo., 339 S.W.2d 759, 764–765 [4]; State v. Archer, Mo., 328 S.W.2d 661, 665 [2]. The court instructed the jury on second-degree murder, manslaughter, and self-defense. To justify reducing a homicide from murder to manslaughter, there must be a sudden unexpected assault, encounter, or provocation tending to excite passion beyond control. State v. Clough, 327 Mo. 700, 38 S.W.2d 36, 38 [1]. There was no such evidence in this case. At most the defendant's testimony tended to establish a case of self-defense. The evidence favorable to the state was substantial and convincing; it was clearly sufficient to support a finding of every essential element of murder in the second degree. State v. Archer, Mo., 328 S.W.2d 661, 665 [4]; State v. Vincent, Mo., 321 S.W.2d 439, 442 [5]; State v. Strong, Mo., 339 S.W.2d 759, 765 [7]; State v. Bounds, Mo., 305 S.W.2d 487, 489–490 [4]. The court did not err in overruling defendant's motion for an acquittal at the close of all the evidence.

A related and dependent contention is that the trial court erred in giving and reading to the jury instruction No. 3 submitting murder in the second degree because there was no evidence to support such a submission. In view of our holding that the evidence is sufficient to support the conviction of murder in the second degree, the contention is without merit and is denied. State v. Vincent, Mo., 321 S.W.2d 439, 442 [7].

The defense of self-defense was submitted to the jury by instruction No. 5, the first paragraph of which explains the nature of the right and tells the jury that if the defendant had reasonable cause to believe that Raymond Glon was about to take his life or do him some great personal injury then the defendant "ought to be acquitted on the

ground of self-defense". The defendant contends that the quoted phrase is not a direction that the jury must or should acquit the defendant upon a proper finding, but that the jury could find the issues in favor of the defendant and nevertheless convict him.

■ In State v. Reese, 364 Mo. 1221, 274 S.W.2d 304, a similar contention was made with regard to an instruction submitting the defense of insanity and this court in ruling the question stated: " 'Ought' expresses bounden duty as well as moral obligation, and carries the idea of conscientious compliance. To be sure, 'must' is a stronger word because signifying compulsion or necessity. See Webster's International Dictionary, pp. 1616 and 1730. But a jury capable of understanding the evidence and finding the facts would encounter no difficulty in determining its duty under an instruction stating that upon finding certain facts they 'ought' to acquit or convict. The objection urged is hypercritical." 274 S.W.2d 308.

The defendant seeks to avoid the effect of the Reese decision by urging that the development of criminal law in the decade since the case was decided has provided more and more safeguards to preserve the rights of a person accused of crime, some of which may seem hypercritical. The meaning of the word "ought" has not changed in any manner that would justify a different result.

Webster's 3d New International Dictionary, recently published, states that ought is "used to express moral obligation, duty, or necessity" and that "OUGHT, SHOULD, MUST, and HAVE can all function as verbal auxiliaries meaning to be bound." In the early case of Life Association of America v. Board of Assessors of St. Louis County, 49 Mo. 512, this court discussed the obligatory force of the word ought as used in various places of the Constitution and stated: "These are all positive injunctions which cannot be denied, and their obligatory force would be in nowise strengthened by inserting the word 'shall' for 'ought.' " 49 Mo. 519.

■ Our examination of all the instructions has led us to conclude that the use of the word "ought" in instruction 5 could not have confused or misled the jury and did not constitute prejudicial error. The assignment is denied.

■ We have considered all questions presented for review and find them to be without merit. The defendant was present throughout the trial including his allocution and sentencing. He was effectively represented by able counsel throughout the trial and on appeal. We have also examined the parts of the record and entries designated in S.Ct.Rules 28.02 and 28.08, V.A.M.R., and find them to be in proper form and free from error.

Accordingly the judgment is affirmed

All of the Judges concur.