**STATE of Missouri, Respondent,**

**v.**

**Lewis Edward SINGER, Appellant.**

**No. WD 37701.**

Missouri Court of Appeals,
Western District.

Sept. 9, 1986.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 4, 1986.

Application to Transfer Denied
Dec. 16, 1986.

---

Mark T. Kempton, Sedalia, for respondent.

Paul LaRose, Asst. Atty. Gen., Jefferson City, for appellant.

Before BERREY, P.J., and PRITCHARD and DIXON, JJ.

BERREY, Presiding Judge.

Defendant appeals his jury conviction of voluntary manslaughter and ten years sentence. Defendant alleges trial court error in (1) admitting defendant's statements into evidence because his warrantless arrest was made without probable cause and these statements were the fruit of the illegal arrest; and (2) overruling his motion for judgment of acquittal and submitting jury instruction No. 7 on voluntary manslaughter because there was insufficient evidence that he caused the victim's death while he was under the influence of sudden passion. After reviewing the record, this court finds no error and affirms the judgment below.

Almost 1,100 pages of transcript reveal that defendant shot the deceased, Christine Staten, following a party at the Buckner Apartments (hereinafter the projects) in the early morning of April 21, 1985. John Goodwin stated he saw defendant drive up in the parking lot of the projects. He went to defendant's car and told defendant that Christine Staten was looking for him. Goodwin entered defendant's car and observed Staten approaching. Although defendant said "oh shit" and rolled up his window as she approached, he went to the rear of the car at her request. Here they argued and Goodwin stated he heard defendant tell Staten not to hit him again. Staten stated "What are you going to do, shoot me" and defendant again admonished her not to hit him again. Goodwin then heard a gun shot and saw defendant lay Staten in the back seat. Goodwin got out of the car and defendant drove off.

Harold Frazier, another party goer, observed defendant and Staten talking at the rear of the car. They were about an arm's length apart when Frazier heard a "pop" and saw Staten stumble forward. He next saw defendant grab Staten and put her in his car and drive off.

Next Thomas Bentley testified he was present in the projects at a party being given by Mary Claxton. As he stood on a balcony at the projects he saw deceased, whom he had known all his life, cross the parking lot to Singer's car. Bentley stated Staten spent ten or fifteen minutes at the

car and then he heard a "shot go off." Bentley looked to the sound and saw Lewis put Staten in the car and drive off.

Harold Frazier, who had known the defendant for quite a few years and the deceased all of her life, likewise testified he was at a party in the early morning hours of April 21, 1985. Frazier had talked with Staten on the balcony of an apartment and saw her go to the defendant's car. He observed defendant and Staten talking at the rear of Lewis' car. He testified he heard a "pop", looked around, and saw Staten stumble. Lewis grabbed her, put her in his car, and drove off. At the time he heard the pop and turned, he noted that about an arm's length separated defendant from the deceased.

Another party goer, Kent Curd, testified he was sitting about forty or fifty feet away in another car facing the defendant and victim as they stood talking. As he watched he did not "observe anything out of the ordinary." Later he saw a flash and heard a shot and saw Staten stagger toward the defendant. At that moment approximately two feet separated the victim and defendant. Staten fell and "defendant picked her up and, put her in the car and he drove off with his lights off."

Walter Staten, brother of the deceased, next testified that he too was at the party. He stated he had known defendant for ten years but not personally. He testified he was just inside the balcony door of the apartment when his girlfriend pulled him out and he saw defendant "had his sister by the arm shoving her into the back seat of the car." He saw defendant drive away with his lights off. Walter Staten ran down the stairs, jumped in his car and followed the defendant. He lost the defendant and stopped at a Colonial Store and dialed 911. He stayed at the store twenty minutes then proceeded to Bothwell Hospital where he observed his sister in the emergency room.

Wanda West, Sedalia police dispatcher, testified she took Walter Staten's 911 call. Staten identified himself and advised West that "his sister had been shot" at the projects. The prosecutor then asked:

Q. And did he give you any names?

A. Yes.

Q. And what name did he give you or names?

A. Lewis Singer.

Q. Did you cause any radio traffic to be issued by you personally—

A. Yes.

Q. —in that regard?

A. Yes.

Q. Do you recall what traffic you issued using Mr. Singer's name?

A. I advised all Sedalia cars that the person that had done the shooting possibly was Lewis Singer and what type car he was in.

Q. What kind of car did you place on the air?

A. Silver car with red stripes, small.

Q. Where did you determine that information from?

A. Mr. Staten.

The dispatcher took the call regarding the shooting and put it out on the air that defendant was a suspect. Sheriff Starke, whose wife was the emergency room registered nurse at Bothwell Hospital, heard the call and proceeded to the hospital. He saw defendant and Goodwin there and asked them if the medical team was working on the shooting victim. The defendant replied he didn't know. The Sheriff then inquired as to the identity of the person being treated and received no reply. Later the Sheriff asked defendant how the victim got to the hospital and he said "I drove her in my car." Following this exchange defendant was quite insistent about moving his car and despite orders to stay put he went to move the car. Sheriff Starke ran after him and brought him back. Again he asked who the person was who got hurt, defendant replied "Christine Staten." Defendant then denied knowledge of how she was hurt saying only that she was hurt in "some kind of disturbance." As people began gathering at the hospital, defendant

acknowledged that some of her family and friends probably thought he was involved in the shooting. At this point he was given the *Miranda* warning. Whether he was arrested at this moment or earlier when the Sheriff directed him to remain in the hospital, is not material. The question of whether probable cause existed revolves around the officer's reliance upon the radio dispatch; the defendant's subsequent actions at the hospital only enhance a finding that probable cause does exist.

After arriving at the police station and signing the rights waiver form, defendant made some damaging admissions[1] which he now claims should be excluded as fruit of the poisonous tree; he alleges the warrantless arrest was made without probable cause.

■ In reviewing a motion to suppress this court is free to disregard contrary evidence and inferences and the trial court's ruling shall be affirmed if there is sufficient evidence in the record to support its finding. *State v. Blair*, 691 S.W.2d 259, 260 (Mo. banc 1985). The determination of whether probable cause existed at the time of the arrest is dependent upon the facts and circumstances within the knowledge of the arresting officers, and if they have reasonably trustworthy information sufficient to warrant the reasonable belief that the person being arrested has committed the crime for which he was arrested. *State v. Reynolds*, 619 S.W.2d 741, 746 (Mo.1981).

■ Here, the arresting officers knew through the police dispatch that defendant was connected with the shooting, and although the record does not reveal Walter Staten, the victim's brother, told the dispatcher that the defendant shot his sister, the dispatcher advised the patrol cars that "the person that had done the shooting possibly was Lewis Singer." An officer has a right to rely upon information communicated as such and to hold it as valid in his decision to make an arrest. *State v. Bradley*, 515 S.W.2d 826, 828 (Mo.App. 1974). " 'If police could not thus base the existence of reasonable cause upon bona fide information communicated to them in the performance of their duties, their hands would be very effectively tied.' " *Id.* (quoting from *State v. Burnett*, 429 S.W.2d 239, 241–242 (Mo.1968). This information taken in conjunction with defendant's actions and conflicting statements made at the hospital was sufficient to constitute probable cause to arrest the defendant.

---

1. At 3:50 a.m. on April 21, 1985, defendant made the following statement:

   About 2:30 or 3 a.m. in the 400 block of Buckner Court Christine Staten came up to me and ask me to take her to the hospital. She walked up to me. I open the door and Christine got in the backseat of my car. I then took Christine to the hospital. Christine did not tell me what happen and I didn't see her bleeding anywhere. When I got to the hospital there was a male and female at the door. I ask them to help and they did help. The two people picked Christine up and took her in the hospital. I parked my car and went inside and met with Sheriff Starke. He didn't talk to me. I kept asking him what happen. Sergeant Mosier came up said he was putting me into protective custody, advised me of my rights and took me to police station.

   "Question, was there anyone around your car when Christine came up?" No, not that I know of.

   At 5:06 appellant made this statement:

   Just before the shooting incident I took Charlotte Bell home (359 Buckner Court.) I left and went to 400 block of Buckner Court, park my car. Then John Goodwin came up and got in the car with me. (Front seat.) Christine came up to the car. I use to go with her. She then started an argument. I roll my window up and lock the door. She then ask me to step out she had something to say. We then went to the rear of the car and Christine ask me why I hadn't been there to see her. She then started to argue at the rear of the car. She then struck me in the face. She struck me four times, two in the face two in the chest. I ask her to go away. She started struggling with me a few minutes. I then realized I had a pistol in my pocket. I told her to leave me alone before one of us get hurt, it might be you. You might get shot in the foot. She said fuck you. I'm not thinking about you or your little pistol. I tried to put the pistol back in my pocket. The next thing I heard was a shot. We were struggling on the back of the car. I heard one shot. She said will you take me to the hospital. I said why? Did it hit you? She said yeah. I then took her to the hospital.

Thus, because there was probable cause to arrest, defendant's subsequent statements made after being advised of his *Miranda* rights, were admissible and not the fruit of an illegal arrest. *United States v. Capers*, 685 F.2d 249, 252 (8th Cir.1982).

Defendant, in his Points II and III, alleges there is insufficient evidence to support his conviction of voluntary manslaughter because the evidence failed to reveal he acted "under the influence of sudden passion arising from adequate cause" § 565.-023(1), RSMo. (Cum Supp.1984). Defendant asserts the lack of such evidence entitled him to a judgment of acquittal. He similarly uses this argument to attack jury Instruction No. 7 patterned on MAI–CR2d 13.08.

Defendant relies chiefly on *State v. Clough*, 327 Mo. 700, 38 S.W.2d 36 (Mo. 1931), and *State v. Bruton*, 383 S.W.2d 525 (Mo.1964), in support of the argument that the victim's action of slapping the defendant was insufficient to establish "sudden passion" and that his actions were consistent only with those associated with self-defense.

In *State v. Bruton, supra*, 383 S.W.2d at 528, the defendant testified that the victim had raised a wine bottle to shoulder height and made a threatening motion stating he was ready to fight (with knives) when he (the defendant) took his own knife from his pocket. When the victim began pulling his hand from his pocket, the defendant stabbed him. The court found the victim's actions were not of a nature to excite passion beyond control and that defendant's testimony, if believed, could only establish a case of self-defense. *Id.* In the *Bruton* case the court noted that the victim "did not strike at the defendant at anytime." *Id.* at 527.

In *State v. Clough, supra*, 38 S.W.2d at 38, the court held there was insufficient evidence to warrant an instruction on manslaughter where the defendant testified the victim, who had made previous threats against him, had thrown rocks at him. The defendant stated that he attempted to back off but when the victim had advanced within six feet of him, he shot to protect his own life. The court stated that if defendant is to be believed he should be acquitted on self-defense grounds. *Id.* at 38. The court reversed and remanded the case because the jury instruction minimized the right of self-defense. Emphasizing the need for a proper instruction, the court noted:

It was for the jury to say whether, by the conduct of the deceased at the time of the shooting, defendant had reasonable cause to believe and did believe that deceased was about to assault him and do him great bodily harm, *even though deceased actually made no threats or an assault or used any personal violence at the time.* The jury might have believed that there was reasonable cause for apprehension at the time of the shooting by reason of the attitude, acts, and demeanor of deceased, in the light of the previous experiences between defendant and deceased, *absent such threats, assault, or personal violence.*

(Emphasis added.) *Id.* at 39. Thus, *Clough* held that a claim of self-defense may exist where, from the victim's actions, the defendant's conduct is excused because of his reasonable apprehension of harm though *no personal violence existed.*

■ Hence, these cases are readily distinguishable from the case at bar. The defendant testified that Christine Staten, the deceased, struck the left side of his face with an open hand and then, with her fist doubled, hit him in the chest. After heated conversation with Staten, defendant further related she hit him in the face with her fist and then hit him again on the chest. He stated that a struggle for the pistol he was carrying then ensued and the gun went off with the shot hitting Staten. " 'Violence to the person is the standard exacted by the law as affording the basis for the inference of that heat of passion which reduces the grade of the crime in a homicide case from murder to manslaughter.' " *State v. Smart*, 328 S.W.2d 569, 574 (Mo.1959), (quoting from *State v. Taylor*, 309 S.W.2d 621, 624 (Mo.1958).

■ It has been the law of Missouri that "where the record shows personal violence—a battery—inflicted upon the slayer by the deceased at the time of the homicide, the general rule is that a manslaughter instruction is called for, and this is true though the evidence consists of the testimony of the defendant alone" (cites omitted). *State v. Creighton*, 330 Mo. 1176, 52 S.W.2d 556, 561 (Mo.1932); *see also, State v. Brookshire*, 368 S.W.2d 373, 384 (Mo. 1963); *State v. Sturdivan*, 497 S.W.2d 139, 142 (Mo.1973). This remains true although there is no proof of the absence of premeditation and malice. *State v. Sturdivan, supra*, 497 S.W.2d at 142. Whether the killing was done under the influence of sudden passion or was the result of the actions taken in self-defense is a question left for the jury. *State v. Clough, supra*, 58 S.W.2d at 561–562.

■ Defendant makes the additional contention that the voluntary manslaughter instruction No. 7, MAI–CR2d 13.08 erroneously states the law because it does not require the jury to find Lewis Singer caused Christine Staten's death under the influence of sudden passion arising from adequate causes as set forth in § 565.023.1. Paragraph 3, in the NOTES ON USE to MAI–CR2d 13.08 states:

Generally, voluntary manslaughter under this instruction will be submitted only as a lesser included offense of murder in the second degree—conventional as submitted under MAI–CR 2d 13.04. To justify such a submission, evidence of sudden passion arising from adequate cause must have been introduced. Once such evidence has been introduced and an instruction on voluntary manslaughter is requested by a party or on the judge's own motion, *then this instruction on voluntary manslaughter will be given.* In this situation, this instruction on voluntary manslaughter will be identical *to MAI–CR2d 13.04 as to the elements of the offense except that MAI–CR2d 13.04 will include the paragraph on negating sudden passion arising from adequate cause.*

(Emphasis added.) The jury instructions in this case tracked the requirements set out above. Instruction No. 6 patterned after 13.04 was submitted to the jury and defined the terms "sudden passion" and "adequate cause." The instructions are mandatory, and this court is prohibited from declaring the instructions adopted by the Supreme Court erroneous. *State v. Mick*, 674 S.W.2d 554, 558 (Mo.App.1984); *State v. Turner*, 705 S.W.2d 108, 110 (Mo.App. 1986).

The judgment and conviction are affirmed.

PRITCHARD, J., concurs.

DIXON, J., dissents in separate dissenting opinion.

DIXON, Judge, dissenting.

I have concluded that I must dissent from the majority's holding that we have no authority to review claims of error in MAI–CR instructions required to be given under Rule 28.02. I realize that there are many cases supporting the position taken by the majority opinion. The seminal case appears to be *State v. Yeokum*, 516 S.W.2d 535, 537 (Mo.App.1974), in which I participated as a panel member. Cases typifying this point of view are:

**Western District:**

*State v. Burton*, 544 S.W.2d 60, 64 (Mo.App.1976)

*State v. Washington*, 570 S.W.2d 838, 843 (Mo.App.1978)

*State v. Grady*, 577 S.W.2d 930, 931 (Mo.App.1979)

*State v. Mick*, 674 S.W.2d 554, 558 (Mo.App.1984)

*State v. Turner*, 705 S.W.2d 108, 110 (Mo.App.1986)

**Eastern District:**

*State v. Blockton*, 526 S.W.2d 915, 919 (Mo.App.1975)

*State v. Crafton*, 579 S.W.2d 662, 663 (Mo.App.1979)

*State v. Finch*, 611 S.W.2d 405, 406 (Mo.App.1981)

*State v. Frank,* 639 S.W.2d 209, 211 (Mo.App.1982)

*State v. Toney,* 680 S.W.2d 268, 278 (Mo.App.1984)

**Southern District:**

*State v. Simpson,* 614 S.W.2d 31, 32 (Mo.App.1981)

*State v. Davis,* 675 S.W.2d 652, 658 (Mo.App.1984)

*State v. Hawkins,* 703 S.W.2d 67, 70–71 (Mo.App.1985)

In *State v. Mitchell,* 704 S.W.2d 280, 284–285 (Mo.App.1986), the Southern District specifically noted that the districts of the court of appeals have consistently denied their authority to review claims of MAI–CR instructional error, but the Supreme Court of Missouri had not yet ruled the issue. While not squarely addressing the question, there is a comment in *State v. Newlon,* 627 S.W.2d 606, 614 (Mo. banc), *cert. denied,* 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982), which indicates that such instructions are not reviewable at all.

In none of the cases is any particular rationale given for the denial of review of MAI–CR instructions. I have come to believe that this interpretation of the power of this court to consider an error on appeal presents an unconstitutional application of the supreme court rules.

In Missouri the right of criminal defendants to appeal is guaranteed by statute, § 547.070, RSMo 1978. That right of appeal is reflected in Rule 30.01 and there is no limitation in either the rule or the statute on properly preserved matters that may be raised on direct appeal. It is further a part of our constitution that the supreme court rules cannot change the law relating to the right of appeal. MO. CONST. art. V, § 5; *State v. Pottinger,* 287 S.W.2d 782, 784 (Mo.1956); *State v. La Driere,* 299 S.W.2d 512, 515 (Mo. banc 1957); *State v. Lynch,* 679 S.W.2d 858, 862 (Mo. banc 1984).

Thus, an interpretation and application of Rule 28.02 concerning the use of instructions which denies a defendant a right to a direct appeal in this court changes the right of appeal. It changes the right of appeal because, if there is no review here, a defendant has no right of direct appeal to any court since his only claim to review by the supreme court is upon a motion for transfer after opinion in this court, the grant of which is entirely discretionary with the supreme court.

I further believe that this application of Rule 28.02 may constitute a violation of federal constitutional rights. Many federal cases have concluded that once the right of appeal has been granted it may not be limited or denied by subsequent action of the state directed to individual cases. Some of the cases and their holdings are as follows:

*Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956).

Error to dismiss appeal of impoverished defendants who could not afford to furnish transcript.

*Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed. 811 (1963).

Indigent defendants were denied equal protection where merits of the one appeal they had as of right were decided without benefit of counsel.

*Rinaldi v. Yeager,* 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966).

Statute requiring imprisoned indigents to reimburse the county for cost of transcript in unsuccessful appeal while not imposing the same burden on persons receiving a suspended sentence, who were placed on probation or who were only fined is violative of equal protection.

*Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985).

Criminal defendant is entitled to effective assistance of counsel on first appeal as of right.

*Blanchard v. Brewer,* 318 F.Supp. 28 (S.D.Iowa 1969), *affirmed,* 429 F.2d 89 (8th Cir.1970), *cert. denied,* 401 U.S. 1002, 91 S.Ct. 1224, 28 L.Ed.2d 535 (1971).

Defendant may not be deprived of appeal of right by any act or failure to act upon the part of the state which unfairly denies him his right of appeal.

Many of these cases find that impediments to the right of appeal are unconstitutional. I believe that the denial of the right of direct appeal to a particular issue offends the principle of those cases. I realize that my dissent flies in the face of a good many decided cases, but sooner or later the issue will have to be confronted and decided.