**STATE of Missouri, Appellant,**

v.

**Donald STRIBLING, Respondent.**

**No. WD 37784.**

Missouri Court of Appeals,
Western District.

Oct. 14, 1986.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Nov. 25, 1986.

Application to Transfer Denied
Jan. 13, 1987.

Robert Beaird, Howard Hoyt, Kansas City, for appellant.

William L. Webster, Atty. Gen., Carrie Francke, Asst. Atty. Gen., Jefferson City, for respondent.

Before BERREY, P.J., and PRITCHARD and DIXON, JJ.

BERREY, Presiding Judge.

Donald Stribling, defendant, appeals his jury conviction of second degree murder and twenty (20) years sentence. Defendant raises two points on appeal. He asserts the trial court erred in: (1) refusing to submit a voluntary manslaughter instruction; and (2) overruling defendant's objection to certain comments made by the prosecuting attorney during closing argument. This court rejects both points of error and affirms the conviction.

The following facts will aid in the resolution of the issues presented:

On the evening of March 8, 1985, Timothy Blaine, the deceased, went out to celebrate his twenty-first birthday with his brother, Mark Blaine, and three friends, Greg Stewart, Larry Farnan, and Craig Pugh. They went to two bars in Westport and had a few beers. They then left the Westport area and went to the Walrus Inn, located at 83rd and Wornall. Mark Blaine, however, was not permitted to go inside because of troubles he encountered there in the past. Inside, Greg Stewart and the deceased met Pat Patterson who invited the entire group to a house located at 8305 Flora; Patterson had lived previously at this address but it was now occupied by

Diane DeMaggio, William Daniel Schulten and the defendant, Ronald Stribling. The group accepted this invitation and drove to the address on Flora.

The state's witnesses—Larry Farnan, Craig Pugh, Greg Stewart—and Kevin Byrom,[1] a witness for the defense, all similarly testified to the next sequence of events. The group walked up to the door of the house and knocked. The defendant opened the door, and Pat Patterson and Mark Blaine led the group through the door and into the house. As they passed by the defendant, no physical confrontation occurred although words were exchanged. Stewart testified he called Stribling a "rip-off"; apparently animosity existed between Stewart, Timothy Blaine and the defendant because of a belief by Stewart that the defendant had burglarized his apartment and had stolen his V.C.R.

The group moved through the living room and into the dining room which was referred to as the "bar room" because it contained a bar which was approximately waist to chest high. This room was the main gathering place in the house when there was a party.

The group continued to socialize among themselves and others they met for approximately fifteen minutes when the defendant entered the room. Greg Stewart testified that Tim Blaine and the defendant had a few words but there was no physical confrontation; he stated this argument did not rise to a level to cause anyone to notice they were arguing.[2] The defendant then made his way through the crowd and went behind the bar. Defendant opened a drawer in the back of the bar and pulled out a gun. He stuck the gun in his pants and walked around the bar into the center of the room where he struck (with his fist) Greg Stewart in the face. Stewart was knocked backwards by the blow. Defendant then took two steps backwards and

drew the gun from his pants and shot Timothy Blaine in the forehead. Defendant immediately left the house with his girlfriend, Diane DeMaggio.

Randall Jacobs and Rex Tarwater, two Kansas City police officers, testified they quickly arrived at the scene of the shooting and found Timothy Blaine on the floor; Mark Blaine and Greg Stewart were in a state of panic and shock and had to be removed from the scene. Dr. Bonita Peterson, the Jackson County Medical Examiner, testified that Timothy Blaine died from this gunshot wound to the head.

The defense called a number of witnesses who testified to a somewhat different sequence of events. The defendant testified that upon the arrival of the group, Greg Stewart and Timothy Blaine started yelling and kicking him. He stated that Mark Blaine attempted to get Stewart and his brother to calm down. As the group moved into the bar room, however, Greg Stewart continued to accuse him of ripping him (Stewart) off; Stewart came towards him yelling and spitting. Defendant told the group to leave and he went upstairs. He testified that the group left and went around to the back door. They kicked it in and re-entered the house. Upon hearing the crash of the back door, he went back down stairs where Stewart began hitting and kicking him. Defendant stated that Tim Blaine did not strike him or that there was any physical exchange between him and Tim Blaine. After telling the group to leave, he walked up and hit Greg Stewart who then fell to the ground. At this point, according to defendant, a brawl started where "there was just a big pile of people." In the midst of this pile-up, defendant stated he saw an unknown man wearing a dark zipped-up jacket reach in his pocket and pull out a gun. He grabbed this man's arm and the gun went off hitting Timothy

---

1. Kevin Byrom's testimony was limited to the events occurring before the actual shooting; he testified he did not see what actually transpired immediately before the fatal shot. He stated that within two minutes after he left the house he heard a gun shot.

2. Kevin Byrom was in the process of leaving when he heard Tim Blaine and the defendant arguing; he testified that it wasn't a "heated" argument.

Blaine. Defendant testified he had not seen this man before and he did not know his name.

Defendant did testify that in the course of the evening he did go to the back of the bar and open a drawer. He stated he kept money in the drawer and he went to put it in his pocket because he was frightened that it might be stolen.

Defendant contends the trial court erred in refusing to submit defendant's proposed manslaughter instruction because: (1) the instruction requires automatic submission; and (2) the evidence revealed the defendant acted "under the influence of sudden passion arising from adequate cause" which resulted in Tim Blaine's death. § 565.-023(1), RSMo Supp. 1984. Defendant's point is without merit for several reasons.

■ The automatic submission rule announced in the Supreme Court's decision of *State v. Stapleton*, 518 S.W.2d 292 (Mo. banc 1975) was effectively repealed by the legislature in § 565.025(3), RSMo Supp. 1984. *See State v. Romesburg*, 703 S.W.2d 562, 566 (Mo.App.1985); *Love v. State*, 670 S.W.2d 499, 502, n. 5 (Mo. banc 1984). This court in *State v. Romesburg, supra*, 703 S.W.2d at 566 stated:

> Section 565.025(3) provides that no instruction shall be submitted on a lesser included offense. Section 565.025(1) states that with certain exceptions, § 556.046 shall be used for the purpose of consideration of lesser offenses by the trier of all homicide cases. Subd. 2 of § 556.046 provides, "The court shall not be obligated to charge the jury with respect to an included offense unless there is a basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense."

Thus, the trial court is not obligated to submit the voluntary manslaughter instruction unless it is warranted by the evidence.

■ The crime of manslaughter is the intentional killing of another in the heat of passion due to reasonable provocation. *State v. Sturdivan*, 497 S.W.2d 139, 142 (Mo.1973). This provocation "must be of such a character as would, in the mind of an average just and reasonable man, stir resentment likely to cause violence endangering life, or as would naturally tend to distrub and obscure the reason and lead to action from passion rather than judgment, or to create anger, rage, sudden resentment or terror, rendering the mind capable for reflection." *State v. Smart*, 328 S.W.2d 569, 574 (Mo.1959). An inference of such "heat of passion" arises when there has been a personal violence committed against the accused. *Id.; see State v. Singer*, 719 S.W.2d 818 (1986). A similar presumption, however, is not indulged when there is only verbal provocation. *State v. Cook*, 560 S.W.2d 299, 305 (Mo. App.1977).

■ Applying these principles to the evidence adduced at trial, we find a lack of the necessary provocation committed by the victim, Timothy Blaine. Defendant testified to a variety of repugnant and antagonistic actions on the part of Greg Stewart, the victim's compeer; Stewart allegedly spit, kicked and hit defendant repeatedly. This combative behavior, however, was not similarly charged to Timothy Blaine. On cross-examination, the prosecutor elicited the following:

Q. Did Tim Blaine ever hit you?

A. Tim Blaine never did nothing to me.

Q. Did you ever get in a struggle with Tim Blaine?

A. No, I did not. Never have.

Q. Never have.

A. I was always on the good side of Tim.

Therefore, we find from defendant's own testimony that the victim allegedly did nothing to antagonize the defendant to a point which would render him incapable of reflecting upon his actions which would warrant the submission of the manslaughter instruction.

Furthermore, according to defendant, his actions did not include firing the fatal shot. He testified that in his attempt to subdue an unknown man in the "free-for-all" the gun went off killing Timothy Blaine. Cer-

tainly, this factual account does not lend itself to the characterization of a crime of manslaughter, an intentional killing in the heat of passion.

■ Defendant also claims the court erred in overruling his objection to the prosecutor's closing argument:

Now, I'm going to tell you what I think happened because Mr. Beaird told you what he thought happened, and while we're on that subject, I want you to remember something that was very striking about what Mr. Beaird told you he thought happened. He never told you he thought an unknown man in a black coat shot Timothy Blaine, which is what his client told you. That's not what Mr. Beaird thinks happened.

He argues that this argument was improper because the prosecutor implied that defendant's attorney did not believe the defendant's version of the facts and that she (the prosecutor) had particular knowledge of that fact. Only when the defendant can establish the closing argument had a prejudicial effect on the jury's decision and that the argument was plainly unwarranted will the trial court be reversed for an abuse of its trial court discretion; one that is giving considerable latitude in its exercise. *State v. Hobby*, 706 S.W.2d 232, 234 (Mo.App. 1986). Comments upon the defense counsel's argument must be of a magnitude exceeding all "bounds of propriety" before the harsh remedy of a mistrial is employed. *State v. Johnson*, 697 S.W.2d 213, 214 (Mo. App.1985).

The prosecutor, in her second half of the closing argument made after the defense had its closing argument, merely observed that defendant's counsel did not review defendant's detailed account of how Timothy Blaine was actually shot. The prosecutor attempted to raise doubt in the jury's mind as to the credibility of this witness by pointing out this omission. The prosecutor does have the right to comment on the credibility of the witnesses. *State v. Anthony*, 577 S.W.2d 161, 163 (Mo.App.1979). Beyond that, the effects of these comments are better evaluated by the trial court who

is in a more advantageous position to make that judgment. *State v. Johnson, supra,* 697 S.W.2d at 214. We find no abuse of that discretion.

Judgment affirmed.

All concur.